Please step up, counsel. Identify yourself and how long you intend to argue. My name is Nicole Jones-Burns. I'm appearing pro bono for the Office of the State Appellate Defender on behalf of Kavanaugh Hughes. I expect to spend about seven minutes on opening and reserve two minutes for rebuttal. Good morning. Janet Mahoney on behalf of the people of the state of Illinois, and I expect to argue approximately seven minutes also. Thank you very much. You may proceed. Good morning, Your Honors. My name is Nicole Jones-Burns. I'm appearing pro bono, as I just said, for the Office of the State Appellate Defender. Should we congratulate you on your change of name since you filed your brief? Thank you, yes. I am here representing Kavanaugh Hughes. The totality of the circumstances surrounding Mr. Hughes' confession to shooting Elijah Coleman in the leg shows that this confession was involuntary. This includes Mr. Hughes' age, his limited education, his inexperience with the criminal justice system, his extreme exhaustion at the time he gave this confession, along with his emotional state and the deceptive practices of the police officers at the time. So let me just clarify. You're not challenging the results of the interrogation up to the time that your client spoke to Detective Mitchell? Correct. We're just contesting the voluntariness of the confession to Detective Mitchell and then the following confessions to Detective Board and Brannigan. Looking at the test for voluntariness, Hughes' confession to shooting Coleman in the legs was not made freely or voluntarily and cannot be considered the product of a rational intellect and free will. Part of this is because he was a teenager at the time that he made this confession. He admitted to using marijuana daily and to... To whom? In his PSI, he stated that. Right. So that's the pre-sentence investigation. I'm looking at what the detectives knew at the time they were talking to him. He didn't tell any of them that he smoked marijuana daily. That's not on any of the videotapes that we have, so we don't know that he said that, no. But looking at the voluntariness test, we have to look at all the circumstances at the time, and he did say later on that he regularly abused cognac and marijuana. So that's just one of the factors. In addition, he also had a 9th grade education. He dropped out of high school with a C and D average. Furthermore, his only prior criminal contact was as a juvenile. This was his first contact with the criminal justice system as an adult. At the time of his confession, he... He was in juvenile courts. Do we know anything other than what the charges were? We know that he had two adjudications of guilt. They were for unlawful use of a weapon and criminal trespass of a vehicle, and more of that was brought out at sentencing. That he was seen by someone with a gun at one point, and that he was found in a vehicle that was not his own. So that is brought out in sentencing, so we do know a little bit more. But nothing violent with his prior... Were those, when you say adjudications of guilt, were they after trial or were they the result of pleas? I do not know. I just know that they were adjudications of guilt. At the time of his confession, he was very emotional about the recent death of his grandfather, who his girlfriend believed to be his only family member. His grandfather had died a couple months beforehand, but during the tape recordings, Mr. Hughes says that he discovered this the day before he gave these confessions. He actually interrupts his interrogation and asks the police when his grandfather died, whether he died peacefully, and then when the detectives leave the room, he says, he wishes he was there, that he really needs him right now. Later on, he compares his grandfather to Mr. Coleman, saying that he reminded them of each other, that he was very angry that this man was dead, because he reminded him so much of his grandfather, and that he was probably very much like his grandfather, reading a book or something of that sort. When he did give his confession, he was in tears. He said that he was lost because of the association that he had between these two men. The characteristics of the interrogation also show the involuntariness of this confession. Mr. Hughes was very tired by the time he gave this confession. He did not give it until 4.52 in the morning. He had gone into Chicago police custody at 2 o'clock Michigan time, and then we have the tape recordings starting sometime around 3.30 Chicago time, but at 4.52 in the morning, he talks to Detective Mitchell and admits to shooting Coleman in the leg. He never admitted killing Coleman. He admitted shooting him in the leg. No, he admitted shooting him in the leg. However, he had been told by Detective Ford that that was the fatal shot, so he may have believed that he killed him, and that was what he was led to believe by Detective Ford. However, the medical examiner's report did not show that that was the case. The statement by Detective Ford to the fact that it was the leg shot that killed him was somewhere around 12.30 in the morning maybe, in the course of I think the lengthiest interrogation, maybe 50 minutes or so, and he didn't confess until five hours later. So how do you draw the line between that statement and his later confession? These are all cumulative things that added up, this deception, so he's thinking about that as he's going through, and then later when he talks to Detective Mitchell, Detective Mitchell disused him and says, you have to tell me the truth because I'm going to testify before the judge about who tells the truth and who doesn't tell the truth, and it matters, and almost immediately after that he confesses to shooting Mr. Coleman in the leg. But the way you characterize it is that Detective Mitchell led him to believe that she would be testifying for him. I didn't see that in her statements. She said, if somebody asks me, is he sorry about it, is he not sorry about it, I'm going to have to tell them, and it's better for you if you're sorry about it. She does say that she's testifying at trial. She didn't necessarily say that she would be testifying for him, and I'm sorry if my briefs led you to believe that's what we were arguing, but that she would be testifying at trial, and she's not capable of testifying at trial because she's the polygraph detective, and the polygraph evidence is not admissible at trial. But if he made a confession to her, whether or not, if it was prior to administration of the polygraph exam, and she's a detective and he admits to her that he shot Mr. Coleman, is she precluded from testifying to that admission because she's a polygraph examiner? No, but what she said was, I have to tell who said the truth and who didn't say the truth, and so therefore leading him to believe that if he failed the polygraph exam, she would be telling the judge, well, he lies, he doesn't tell the truth, and that was what she said. She didn't say, if you confess to me, that will go before the judge. She said, if you tell me the truth, I'll be able to tell them he's a good guy and that will help you out, or I'll be able to tell them he's a bad guy and that will not help you out. Do we know actually what happened in the polygraph? She said he lied, but obviously there's no evidence at the trial on that. But you say it was a lie, in your paper you say it was a lie to say that he failed it. Do we know one way or the other whether it was even a test that was performed of any viability? Well, the detective said that she did perform a polygraph exam. Whether or not he failed it, she was not happy with some of the answers, so they asked him further questions. But that doesn't mean he passed or failed it. No, he didn't. But she led him to believe that he failed. She led him to believe that he failed and that he needed to tell her the truth and that she would be testifying at trial regarding that. And what she said was, when I asked you the question of whether you had a gun in the house, and you said no, the machine went down, meaning that's not a true answer. Is there any indication that that was not an accurate read of the results of the polygraph? No, there's no indication that that is an inaccurate read of the results of the polygraph. And I wouldn't say that that was the deception. The deception was that she said that she was going to testify at trial about the results. I wouldn't say that she necessarily deceived him about the results of the polygraph itself. And so other lies that you've identified were his fingerprints were found at the scene? There's no evidence of that. But who told him his fingerprints were found at the scene? Detective Ford told him that his fingerprints were found at the scene. The transcript says, Detective Ford says, we have your DNA, we have your fingerprints. They had just taken them. I didn't see him say, we found them at the scene. Am I missing that? You're probably not missing it. You probably have the transcript in front of you, whereas I don't. But he did lead him, I believe, the way he said it and the way it's said on the tape, to believe that we have your fingerprints from the scene. He might not have used those words, but the way he spoke to him did indicate that from the viewing of the video. And Detective Ford later admitted that he had misled the defendant. Correct. At trial, he says, yes, I purposely deceived him in order to get him to tell me more information because I believed he had more information. And so while he might not have said at the scene, he knew that he was deceiving this 19-year-old who was in this emotional state, who was tired, into believing that they had more evidence against him than they did, that they had eyewitnesses against him. So all of these errors, all of these factors together, cumulatively, it's not one thing. It's all of these things together that made this later confession involuntary. Now the state principally argues that this was affirmatively abandoned below, and I just want to address that really quickly. Based on the words from defense counsel, these are the grounds which we will be proceeding because we have filed a general motion. This wasn't a boilerplate motion. It was a motion that addressed a lot of different things. So proceeding on could mean these are what we are focusing on today, what we will be proceeding on when we talk about oral argument, and there are reasons why. You know, you look at the transcript, and the transcript focuses on, was Mr. Hughes Mirandized in Michigan? Did the detectives talk to him on the ride from Michigan to Chicago? If he was already Mirandized in Michigan, does it make any sense to re-Mirandize him in Chicago? That undercuts the credibility of the detectives. And then the arguments focused on that, and so the trial judge was asked to rule, make findings on credibility about when Mr. Hughes was Mirandized and whether he was interrogated on the ride from Michigan to Chicago, and he made those findings. I don't see anywhere that the trial judge was asked to make findings on any of the issues that are raised in your brief, and if it's a manifest way to the evidence standard, which it is for findings of the trial court, how do we judge whether those findings are correct if we don't have that evidence in the record? Well, we do have, first, to answer your initial question, we do have evidence that we asked the trial court to find on these issues because there's a motion to suppress, a written motion to suppress, that says these are involuntary because of the, and I'm quoting, due to his physical, physiological, mental, educational, psychological state and capacity, and because he was confronted with material misrepresentation. So that's all in the written motion to suppress. And although the defense counsel did not orally argue every issue in her written motion to suppress,  and in fact, the trial court, and this is even in the state's brief, expressed the allegations in the written motion to suppress of mental coercion, physical coercion, and said, no, I disagree with that. I guess I'm having a hard time understanding if the manifest way to the evidence standard applies to findings made by the trial court regarding physical coercion, emotional coercion, and the proponent of the motion presents no evidence to the trial court, nor asks for any findings on those. How can we do our job? Well, they do present evidence. There are 24 hours of tape, which is principally what we're relying on here, which is before this court, just as it was before the court below. And there aren't issues of fact about whether or not these things happened. It's just whether or not this constitutes an involuntary confession. So where is the request from defense counsel to the trial judge to say, you know, it's the totality of the circumstances on these however many hours of tapes that we have, and we want you to look at all of that and make a finding as to whether the totality of the circumstances resulted in a coerced confession. I just don't see it in the record. It's in the written motion to suppress, and the judge does say that he reviewed all of the tapes and decided that it was voluntary. So it's your decision de novo whether or not to decide that it's voluntary or involuntary, and we would argue that looking at the tapes, viewing the tapes, seeing his condition at 5 o'clock in the morning when he gives this confession, that it is involuntary. But all of that is detailed in the written motion to suppress, and we can't ignore that the written motion to suppress existed. Just because this was not orally argued in front of them, a lot of things happened on the papers, and this is one of those issues that was raised within the papers. And then, again, it's a motion for new trial. And it was motions in limine. Wasn't some of these issues raised there? Right, right. In the motion to suppress and the motion in limine, yes. These are the issues that were raised, and they were all written out, and the judge didn't have to say, you know, I don't find it involuntary because I don't find that he was sleeping enough, or I don't find that he was emotional enough, or I don't find that he was physical. The judge said, I found this to be voluntary, but you get to review that de novo. If there are no further questions, we ask for all these reasons that you reverse and remand on the murder of Elijah Coleman. Thank you. I'm sorry, I do have a question. After the trial, there was a motion for new trial, and these issues were raised in the motion for the new trial? In the motion for new trial, they addressed the motion to suppress and said that the court erred in denying the motion to suppress. In the same detail? Not in the same detail, no. It was a very detailed motion for new trial, and there were many issues raised, but they did not actually reiterate everything that was within the motion to suppress. Thank you. Thank you. Ms. Mahoney? Good morning. Again, Janet Mahoney on behalf of the people of the State of Illinois. The issue raised here today was affirmatively waived, and it's very simple to figure out how that was. Many of the facts that counsel presented to you today came from the trial or the pre-sentence investigation report, and the Illinois Supreme Court has made it clear that in reviewing a motion to suppress, the court may look at trial evidence to affirm a decision not to reverse the decision. And the reason for that is because the court didn't have the benefit of that information, the state didn't have the benefit of that information, or the opportunity to rebut that. The motion that was filed here was boilerplate. Yes, it was long, but it's boilerplate. Not enough information for the state to proceed on. Clearly the state asked for clarification, as evidenced by the offering remarks of defense counsel, when she indicated that what they were going on was the lack of Miranda being read in Michigan and the conversation that allegedly happened during the car ride. And that is what the court ruled on. But didn't the court also state that he reviewed the video? He reviewed the video, but the issues about lack of sleep, if that had been brought up, the state could have presented evidence about how much sleep he had in Michigan during custody. There was evidence in the video about how much he slept in there. There was no opportunity for the state to rebut that because it was never raised. The idea of the marijuana use and the abuse of cognac, again, that was never addressed because it was never brought up at that time. In fact, that's not really as relevant as I thought the argument that Ms. Burns was raising had to do with the tape, basically the tape from the 3.30 when they started taping until about 5 o'clock in the morning. What occurred there in that confession is all within that tape. We don't have to go outside that tape. Because the lies that she mentioned were all within the tape. That was on the tape. That was the only thing that was on the tape. Everything else that was argued, well, and the information about the grandfather dying, there was information about that on the tape. But the lack of education, his youth, that was not within the tape itself and wasn't reviewed by the court. I mean, how old did he defend it as a judicial notice of education? Well, in terms of how sophisticated he was in responding to that, you know, not every 18, 19-year-old is the same. Could the state have presented evidence to rebut any kind of claim that he's so young that he couldn't figure out what was going on here? No opportunity to bring in any evidence of his prior experience with the criminal justice system. No opportunity to bring in his educational records. As a matter of fact, the court on the record a couple of times commented on how intelligent he found this defendant. And yet, here we are talking about his lack of education. Could the state have found evidence talking about, yes, you know what, he was actually very bright. He just simply was lazy and didn't show up to school and got kicked out for behavioral issues and nothing to do with academics. That possibly could have happened. But we don't have that information here because this motion wasn't presented to the trial court. It was a motion dealing with Miranda. And the court actually granted defendant a little leeway that had to do with the handcuffing issue because there was testimony about the handcuffing. And that was a little leeway that the court granted the defendant. And other than those two issues, that was the only motion at the trial level. That is the motion that is on review here. It's impossible to use the trial evidence and the PSI evidence to overturn what the trial court did because he didn't have that evidence when he passed on this motion. And as you pointed out in the beginning, this is only challenging what was stated at the time of the polygraph. Interestingly, at the beginning of the recordings, defendant admits he's there. He's part of the plan. He knows the plan is to shoot. This was a bench trial. He's 100 percent accountable automatically. Whether he was charged with accountability? Well, it's a bench trial. I'm just asking. I mean, he's charged with murder, so he's charged with everything that falls within that. And he can be found accountable under that in a bench trial. But the issue here is the confession. Correct. It is. But if you were to even take out that part of it, which this is an affirmative waiver on top of a forfeiture because the motion for new trial is inadequate. It just said that the court erred when it denied his motion to suppress. That's not enough to preserve this issue under even a forfeiture. So the layers begin with affirmative waiver. So if we find a forfeiture, then we go to the plain error analysis. And you decide whether either the evidence was closely balanced or the error rendered the trial fundamentally unfair. That is true. And that would only be if you actually get to the forfeiture part of it. If it's an affirmative waiver, it's the state's position that you don't even get to the plain error. Plain error doesn't apply to this affirmative waiver, this decision not to pursue the motion that was presented here to you today. But under plain error, the evidence here wasn't closely balanced. Well, one of the statements the state makes in its brief is it would have been impossible for a defendant used to be under the influence of any substance at the time he spoke to the detectives in this case. Do you recall that? Yes. Okay. And do you know whether he was under influence of any substance? He had been in the Michigan jail. Okay. So when was the last time he had an opportunity to have anything? Again, that would have been nice if we're going to be talking about it. It would have been nice for the state to be able to go back to Michigan and say, hey, how long has he been in jail here? Well, what happens if, hypothetically, immediately before he's taken for the polygraph test, he smokes marijuana in a detective's note? Would that change anything? Well, that's a hypothetical. That's not what we have here. That would be different. That would be a completely different situation, but we don't have this. All right. If you look at the tape, I'm going to give you my hand. Look at the tape, which we did. The officer comes in, smells the marijuana, and says, have you smoked a bud, which is slang for marijuana? He admits it. The officer detective does nothing, and they take him to the polygraph. It's all on tape. That's a lot of speculation. No, it's not. It is. You don't know what he meant by those words. You're saying it's slang for that. Maybe it's slang for something else in there. You need to have the officer testify to that. No, if you read the transcript, if you look at the tape, there is no doubt. He even admits, I have marijuana. I just smoked it. And the officer says, well, how could you have lit it? He says, well, I took the cigarette. I still had the cigarette lit, and I used that to do it. It was in my pocket. It's the last one. I'm all done. And then the officers take him immediately to the polygraph test. First, that's not the issue raised in the defendant's brief. That is not an issue that was raised. It's not an issue litigated. She didn't say that he had been smoking in the interrogation room. It is an issue that was litigated below. She said he abused marijuana and alcohol, but she didn't say that he was using marijuana in the interrogation room. No, but the video is on. It's part of the evidence. We review the evidence. You've asked us to review DeNovo, haven't you? She has asked you to review DeNovo. What do you think we should do? I'm saying that you have to review the court's ruling based on the evidence that the court had for manifest error. Well, the court had the tape. They watched the video. The court had the tape, but this issue wasn't presented. And on review, it is the issues that are presented to you that you are to review, not to look through it to find a different one that the defense counsel didn't raise. How is that a different issue? The whole circumstances, we're supposed to look at all the circumstances involved. That's what the test is, you know, the five factors that we have to look at in order to weigh the facts and the circumstances. This is part of the circumstances. And, in fact, it might have been such because you, in your brief, even raised the fact about substance abuse and that it would be impossible. And here we have a situation where the actual tape which we looked at contains it. And it can't be missed. It can't be missed. I believe you would need to have the testimony of the officer in order to make that decision because he had been in custody in Michigan. So for the Michigan police to miss this in his pockets, for the Chicago police to miss it when they transport it, for the Chicago police to miss it when they processed him, I believe it is not something that can be decided by this court in this case. It would have to be an issue that was actually dealt out in court with live testimony. It is not enough to look at the tape. So the tape's in evidence, though. It is in evidence, but it's not enough. So are you saying that with regard to the polygraph test and what happened there, we can't have, that's on the tape, unless there was testimony about it, we can't consider it. So we can't consider the polygraph exam because there is no testimony. No, that's not what I'm saying. How can you differentiate the polygraph test from him smoking marijuana? It's your conclusion that he was smoking marijuana in the jails. It's not a conclusion. It's a conclusion based on what you saw. And for all we know, for all we know, that isn't what actually was happening. You need to have that officer testify in plain language what is it that you meant by that. Did you actually think that he was smoking marijuana in there? Well, then maybe we need to have the polygraph examiner testify about the polygraph exam. The point is that this isn't the motion that was presented to the trial court. And, add in, this isn't the issue that was raised in the defendant's brief. Well, the raised issue is physical and mental condition. It goes beyond what the defendant has raised here today. Isn't under the influence of drugs part of physical and mental condition? He didn't say that he was in that interrogation room smoking marijuana because he also mentioned the alcohol. So is it to say that he was also in there drinking alcohol? No. He's saying that he was a substance abuser and, therefore, it affected his ability to give a coherent statement. And what I'm saying by raising this here today about him smoking marijuana in the interrogation room is wholly different than what was raised in the brief and was never litigated by the trial court, which is what we are reviewing here today. But the trial court did see the tape. Saw the tape and considered it for the motion that was presented to him that dealt with Miranda. It didn't deal with the voluntariness based on substance abuse. It was Miranda and whether the handcuffs were tight. So let me just, so when Ms. Burns gets up, too, the question, the detective comes in the room and says, change in plans, bro. Get dressed. Answer, can I get a square, Joe? Question, yeah. Question, what's the F, oh, no, the question from the detective. What the F were you doing in here? Answer, uh, question, you're smoking in here now that we're all sitting in here smoking. What were you smoking? Buds? Marijuana? No, buds. He says buds. Answer, yeah, smoking buds. Question, where, how did you get it lit? Answer, off the one I had, just kept smoking until I fell asleep. That's the last one I had right here. All right. It is the people's position that he was not in there smoking marijuana. Buds can be the little pieces that are left on the ground after somebody's had a cigarette, and he's picking those little pieces up and smoking whatever it is left in there. The officer already knew that he was smoking cigarettes because they were smoking together beforehand. So that's not new. He wouldn't have gone in and said, oh, you're smoking cigarettes, because he already knew they were smoking cigarettes. Under that scenario, the defendant's sitting in there chain-smoking marijuana, and nobody notices? Nobody noticed. No, not until they come into the room. Nobody ever noticed while he's sitting in there chain-smoking marijuana. No, no, no, he was smoking cigarettes, and he's changed and smoked his last marijuana is what he said. He had one marijuana. One marijuana. I believe that it's open to discussion. I believe it's something that needed to be taken up in the trial court, and it was not. This was not argued in the trial court. It's affirmatively waived. It's forfeited, and it's also the people's position that this was not raised in the defendant's brief in the manner that is being argued here right now. Unless you have any other questions, the people request that you affirm the conviction and sentence. Thank you, Raymond. Ms. Briggs. Just a few short points. The state just argued that the evidence at trial can only be used to affirm. They cited a 1958 case from the Illinois Supreme Court for that. There have been more recent cases, such as Gilliam, which is in 1996, that says the entire record, including trial testimony, can be used by the appellate court, by the reviewing court, to decide a motion to suppress. So you have the entire record before you, not just what was produced in the motion to suppress, but including the PSI and the trial record to decide whether or not this was voluntary based on the totality of the circumstances. Did you raise in your brief an argument that your client had just smoked marijuana prior to the polygraph? I did not raise that specific issue in my brief. No. I did raise that he regularly used marijuana and that the state did not prove that he was not under the influence of marijuana when he made this statement. That I did state. I did not state that at that particular time, when he pulled out the bud from his pocket or wherever he pulled it out from, that that was marijuana. No, I did not argue that in my brief. But I did argue that he was. What basis can we consider it? The argument of the state is we can't consider it because you didn't raise it specifically. It's within the tapes that are considered before you. And I did ask that you consider the totality of the circumstances, everything that's on the tape. What the tape shows is that he reaches somewhere and he pulls out something and he's got a paper and he's rolling it and he lights it with the cigarette that he had left. Now, isn't it possible that if this issue had been raised at the trial court, the detective would walk in, would say, I walked in there, I saw all this smoke, saw that the interrogation room was smoking, and I said, what have you been doing in here? And he says, I've been smoking butts. Where'd you get a butt? I mean, you have corrected the transcript from this interview in certain instances by saying the defendant didn't say, nobody loves me. The defendant, as he's walking around talking to himself, said, everybody loved me. So how is it that we can now say the trial court erred in making a finding it wasn't asked to make? I mean, that hearing would have looked different had this issue been raised, that he was under the influence of marijuana at the time he was taken for the polygraph. And the detective, for all we know, could have come in and said, I saw a lot of smoke in there, I didn't smell marijuana, I had no idea that he was smoking marijuana. So I'm kind of at a loss. It seems to me that for us to address all of the issues that the defendant is raising, we've got to just excuse that most of them were presented to the trial court. The state had the burden below to show beyond a preponderance that this was voluntary. And they weren't precluded from doing so. They had the entire tapes in front of them. It was the police officers, it was the state of Illinois police officers that interviewed him. And so they had all of this, and they could have presented it, and they could have said, and by the way, you'll notice on the tape, he's asked when he pulls out this thing, what is it? It's a bud. It's a cigarette. They had an opportunity to do that, and in fact they have the burden on them to do that. If the defendant raises no issue on the motion to suppress that he was under the influence at the time of the polygraph, I don't understand your conception of the state's burden. Because the state doesn't have to prove a negative until the defendant says, I was coerced. I was under the influence. But in the written motion, the defense counsel did argue that his physical and his mental condition and everything put together was involuntary. Once they raised that in the written motion to suppress, it becomes the state's burden. Unlike 103-2.1, which they raised orally, where the defense has a burden to show that there was some sort of interrogation and custody, which was what they were arguing orally because it wasn't in the written motion. They were arguing whether or not there was some sort of interrogation in that car ride between Michigan and Chicago. Here, we're talking about voluntariness, and that's raised in the written motion, and then it becomes the state's burden. The defendant doesn't have a burden unless it switches over. Where are the findings that the trial court was asked to make that we review under the manifest weight standard regarding voluntariness? Where are they? The voluntariness is the legal decision, whether or not this was voluntary, looking at all the facts. The facts are right now not contested. They're the facts that are on the tape. So you can look at the tape, and you can make a reasonable conclusion from the tape what happened. And looking at the tape, the tape is very clear what happened. The tape is very clear about when he slept. The tape is very clear about when he was smoking cigarettes, when he pulled something out of his pants, when he was crying, when he was talking to his father. And what he said, the transcript was not the evidence. It was conceded to at the motion to suppress, but the court in trial said the transcript is an evidence, and even the state said the transcript is an evidence. The evidence is the videotape. And the videotape is nobody's contesting that the videotape was somehow tampered with. You have the videotape in front of you. And in the written motion it says, look at this videotape, look at all these conditions, look at the material misrepresentations that were made to this defendant, and you'll see that this is involuntary. And although that was not orally argued, it was in the written motion. And the written motion must have more of an affirmative waiver than what the state's arguing. And even if you look at the cases that the state relies on, Coleman, Schmidt, McAdrian, they're very different from here. In Schmidt, there was a motion to sever that was just ignored, and then there was an agreement. We're going to pretend that this was, between the co-defendant and the defendant, that this was severed and just proceed with these simultaneous trials. There is no agreement here that we're going to say, and we're just going to ignore the motion to suppress. We're just going to ignore what I put in there. We're going to ignore it, and we're going to say it's voluntary except for these handcuffs. It's voluntary except for in case he made this interrogation from Michigan. That wasn't stated out loud. That wasn't stated anywhere written. There was still a written motion to suppress. In Coleman, he only challenges the statements in his written motion to suppress and his oral motion to suppress that are made to a federal agent. And later, he wants to contest these statements that are made to a state police officer. Well, he never even mentioned the state police officer. Here, we have a written motion where he says this is involuntary for all of these reasons. And an ambiguous statement like, this is what I'm going to be proceeding on today, does not waive everything that's within the written motion to suppress. Just one more point. The state says that the court found Mr. Hughes to be intelligent, and that's true, but that's just one of the factors. Education is actually considered separately from being intelligent. So even an intelligent person who is uneducated and unexperienced can give an involuntary confession. He was certainly conversant with the theory of accountability. Wouldn't you agree? I don't know if he was conversant with it. He said a couple of times, if I'm accountable, Jetun's accountable. We all accountable. So he mentioned a few times his understanding of the concept of being there, even being the lookout, rendered him accountable. I don't know if he knew that accountable meant as a legal term. I don't know if we can conclude that from his statements. I do think that he found Jetun to be just as responsible, just as accountable, just as much a part of this as he was. And he was very upset that she kind of got off of this, got free. So, yes, I think that he was upset about that, but I don't know if he knew accountability as a legal principle. And I mean, being that this was his first time in the adult criminal justice system, I think it's hard for us to come to that conclusion. It's speculation. But he does use that word. That's correct. He does use that word. But I don't know if we can conclude that he knew legally what that meant. But he is an intelligent individual, but that does not mean that his education should be ignored or that his inexperience with the criminal justice system should be ignored or the other circumstances that make this an involuntary confession. For all of these reasons, we ask that you reverse. Thank you. Thank you. I'd like to thank Ms. Burns and Ms. Mahoney for their arguments and the case be taken under review. Thank you.